## IGNATIUS COSGRAY. *vs.* MICHAEL CORE.

### July Term, 1867.

1. Where a deed for land is made to A which is not recorded, if B have knowledge of such deed and especially further knowledge that the land was claimed by and had been in possession of A for a long time prior to a deed to B from the grantor of A, a deed by the grantor of A to B for the same land, although recorded, vests no title to the land in B.

2. In a suit for partition of land where one of the defendants, who is a husband, is entitled in his own right or as tenant for life in right of his wife to all the residue of the land, except what was decreed the complainant, and the wife dies pending the suit, and her heirs who are his children are made parties defendant, it is error for the court below to undertake to determine as between the heirs who were thus made defendants, their respective rights and interests and make partition between them, wholly unasked by any of them.

3. D, by his last will, devises land to the children of his daughter J, who married B by whom she had five children, three of whom died without issue and unmarried after the death of the testator. HELD:

> That the interests of the three deceased children in the land passed by the statute of descents to their father B and not to their two surviving sisters.

At the June rules, 1856, *Michael Core* filed his bill in the circuit court of *Monongalia* county, *Virginia*, against *Ignatius Cosgray* and *Elizabeth* his wife, *Daniel Diamond*, *Henry Diamond*, *Abraham Shriver* and *Isaac Wharton*, in which it was alleged that *Daniel Diamond*, late of *Fayette* county, *Pennsylvania*, made his last will and testament and departed this life; that said will on the 23rd day of January, 1827, was duly proven and admitted to record in the probate court of said county of *Fayette*, and a duly authenticated copy thereof had been produced in the county court of *Monongalia* county,

---

* See page 187.

*Virginia*, and there admitted to record as a valid will of lands; that said will directed that a certain tract of land lying in said county of *Monongalia* should be sold, if necessary, to pay the debts of the testator, but that these debts having been satisfied without a sale of said land, the same became subject to another provision of said will directing that the same be equally divided among testator's children, to wit: *Daniel Diamond*, *Henry Diamond*, *Catherine Smilie*, *Jane Barnes*, and *Elizabeth Cosgray;* and that the children of his daughters *Catherine Smilie* and *Jane Barnes* should hold respectively *per stirpes* instead of their mothers; that *Samuel Smilie*, a son of said *Catherine*, by inheritance and by purchase, became entitled to one-fifth and one-fourth of one-fifth of said land, which he had conveyed by two separate deeds to the complainant *Core;* that said complainant had also obtained title to one-fifth and one-third of one-fifth of said land by deed from the children and heirs of *Jane Barnes*, and that the remainder of said tract of land belonged to the defendant *Ignatius Cosgray* in his own right and in right of his wife; that said tract contained about 714 acres and lay adjoining other lands of the complainant; that said *Ignatius Cosgray* has sold 11½ acres of said land to the defendant *Shriver*, and 50 acres thereof to the defendant *Wharton*. Partition of said land was prayed for between the complainant and the other parties entitled thereto. Copies of the will of *Daniel Diamond* the testator, and of the deeds under which complainant claimed were filed as exhibits with the bill. Process was duly served upon the defendants *Cosgray* and wife and *Shriver* and *Wharton*, and order of publication duly taken against the defendants *Henry* and *Daniel Diamond*.

At the spring term, 1857, of said circuit court, the defendants *Cosgray* and wife filed their joint answer to the bill of the complainant in which it was alleged that said land was of little value at the death of the testator and the title thereto involved in law, in consideration of which it was verbally agreed by and between the several devisees of the testator and respondents, that respondents should have said

land for certain sums then agreed upon, which respondents had long since paid, and respondents were to take possession of the land, pay the taxes thereon and defend the title thereto which was then threatened. And that more than twenty years before the institution of this suit the respondent *Cosgray* by himself and his tenants took possession of said land and continued to hold such possession up to the present time, made valuable improvements thereon, paid the taxes and defended the title thereto, and that respondents having enjoyed the peacable and undisturbed possession of said land under a *bona fide* claim of right for more than fifteen years before the institution of this suit, title vested by operation of law, in respondents to said land, and was a bar to the recovery of the complainant; that respondents being apprehensive of some difficulty under the verbal arrangement made with the devisees aforesaid, proceeded to obtain from most of them agreements in writing in accordance with the verbal ones; one from *Samuel Smilie*, son of *Richard Smilie*, for his share in his grandfather's land, being one-third of one-fifth of said tract, dated 25th of May, 1846; a deed dated 6th of March, 1847, from *William Smilie*, son of *Richard*, and *Jane* his sister to respondents for all their interest in said land, being two-thirds of one-fifth thereof. On the 3rd of April, 1849, *Daniel Diamond*, son of testator, and his wife conveyed their share of said land to respondents, respondents also obtained from *Daniel* a son of *Henry Diamond* son of testator a deed for his interest, being the one-half of one-fifth, his sister *Margaret* who married *Westall Barnes* being entitled to the other half of said fifth, which also respondents claimed to have purchased; that on the 2nd day of March, 1849, *James Barnes* and *Jane* his wife, late *Jane Diamond*. sold and conveyed to respondents one-fifth of said land, one-half in their own right by purchase from their daughter *Ann* and the other half as guardian of their daughter *Hannah Barnes* in right of her mother, by virtue of which purchase, conveyances and agreements respondents claimed vested in them title to the four-fifths of the whole tract, and including respondent *Elizabeth's* one-fifth, entitled respondents

to the whole tract. It was also charged in the answer that complainant had knowledge that respondents had purchased and paid for said land and had enjoyed the same for the term aforesaid and made valuable improvements thereon, and finding that respondents' title papers were not recorded, procured a deed from one *Samuel Smilie* and wife on the 6th of December, 1865, purporting to convey the one-half of one-fifth of said land to complainant, and two days afterward to-wit on the 8th day of December obtained another deed from said *Samuel* and wife purporting to convey three-fourths of one-fifth of said land to him, and on the 21st of the same month complainant obtained from *Westall Barnes* and wife a deed purporting to convey to him one-half of one-fifth and from *John Corothers* and *Elizabeth* his wife, late the wife of *Henry Diamond*, for one-third of one-fifth of said land. Respondents charged that, complainant had means of knowing and did know that respondents long before had purchased all the respective interests in said land for which he (complainant) had obtained deeds, &c. Respondents filed with their answer the exhibits therein referred to, and at the November term, 1863, of said circuit court a decree was entered in said cause appointing commissioners to partition said land between the complainant and defendant *Cosgray*, and to assign to the complainant one-fifth and three-fourths of one-fifth of said tract absolutely, and also one-half of one-third of other one-fifth to be held by him for and during the life of *Elizabeth Corothers*, wife of *John Corothers* widow of *Henry Diamond*, deceased; and that they assign the residue of said tract to the defendant *Cosgray*, being three-fifths and one-fourth of one-fifth; one-fifth for life in right of his wife, one other fifth for life under his deed from *Daniel Diamond*, son of testator, to his wife, *Elizabeth*, and for life in right of his wife, one-half of one-fourth of one-fifth in his own right, and one-fourth of one-fifth under his deed from *James Barnes* and his wife *Jane*, to him and his wife *Elizabeth* which they derived by purchase from their daughter *Ann*, one-fourth of one-fifth under his purchase from *Samuel Smilie* on the 26th of March, 1846, the same being conveyed by deed dated 6th

of March, 1847; the said share of said *Cosgray* being subject
to the said half of one-third of one-fifth for and during the
life of the said *Elizabeth Corothers*. And at the February
term, 1864, from an affidavit filed in the cause it appeared
that defendants *Elizabeth Cosgray* and *Isaac Wharton* had de-
parted this life more than two years prior to said term, it was
ordered that the cause be revived against their heirs by
*scire facias* or other due process of law, which was accord-
ingly done. And at a circuit court held on the 14th of Feb-
ruary, 1866, *John Cosgray*, son of *Elizabeth Cosgray*, deceased,
filed his answer and adopted substantially the joint answers
of his father and mother as part of his answer.

At the February term, 1866, the commissioners hav-
ing made report, a decree of partition was entered in pur-
suance of the decree of the November term, 1863, assigning
to the complainant in fee (the widow of *Henry Diamond* hav-
ing departed this life,) 227 acres of said land, and to the
heirs of *Ignatius Cosgray* the residue of said tract in fee sim-
ple, being 441 acres, excepting such portion thereof sold to
*Wharton*, and excepting the life estate of said *Ignatius Cos-
gray* in said residue as indicated by the decree of Novem-
ber, 1863. From the evidence of *Isaac Wharton* taken in
the cause it appeared that witness saw *Samuel Smilie* at the
house of complainant and in the presence of complainant,
he, (witness,) asked said *Samuel Smilie* if he was not the man
who had sold his interest in said land to defendant *Cosgray*
for a young horse. Complainant went out of the house on
an errand and witness went out after him, and told him that
that was the man that sold his interest to *Cosgray* for a horse.
*James Barnes*, a witness sworn for the defendants, testified
that he married *Jane*, a daughter of the testator, and had by
her five children, to wit: *Ann, Jane, Christianna, James* and
*Hannah*. *Ann* and *Hannah* are the only two now living.
But two of said children were born at the death of the tes-
tator; the three children who are dead all died since the
death of the testator in infancy and without issue. Witness
bought the interest of his daughter *Ann* and her husband,
(who married a man by the name of *Abrams*,) and sold it to

*Ignatius Cosgray* to whom witness executed a deed. *Henry Diamond*, son of testator, had three children, *Daniel*, *Margaret* and *Elizabeth; Margaret* married *Westall Barnes*, and *Elizabeth* died before the testator.

From the decrees of the November term, 1863, and of the February term, 1866, rendered in this cause by the circuit court, the defendant appealed to this court.

*Philip H. Keck* for the appellant.

*George H. Lee* for the appellee submitted in substance the following argument:

The appellee claims one-fifth and three-fourths of a fifth of the land in controversy and this quantity has been decreed him by the court.

The appellant claims the whole land:

1. Under verbal agreements with those entitled under the will of Daniel Diamond the elder, in pursuance of which he paid the amounts stipulated and took possession of the land, which possession he has held adversely for a time sufficient to constitute a bar under the statute of limitations.

2. Under certain written contracts with and deeds from those entitled under the will of the said Diamond, of which the appellee had notice at the time of his purchase from Barnes and wife and Samuel Smilie, and which therefore gave him the better equitable title.

The alleged purchase by verbal contract shortly after the death of Daniel Diamond is utterly unsustained by proof and is wholly improbable. That he should have made a purchase of a large and valuable tract from the numerous parties entitled, some of whom were infants and some married women, without taking any writing from any of them and without being able to say how much he was to give for any share is a very incredible story indeed, and we find him as late as 1853 buying in shares of the land which he says he had bought and paid for so many years before and of which he had held undisturbed possession for so long, and paying considerable sums of money for the same. But the evi-

dence clearly disproves this pretension. It shows that he was not claiming adversely to the others jointly interested, but was acting for them as well as for himself. It shows that the relation subsisting between them was that of joint owners, and that this relation remained unchanged except as the appellant and appellee purchased in the rights of some of those entitled. From this and the other proofs in the cause it plainly appears that on taking possession of the land, putting tenants upon it, paying taxes, &c., he was acting on joint account of himself and the others entitled under the will of Daniel Diamond, and that his possession which was in no sense that adversary possession as to them, could serve to found a claim to the land under the statute of limitation. The possession of one joint owner will not be presumed to be adversary to the others. It must be distinctly proven to be such. The claims of the parties must therefore be regarded as unaffected by this pretended verbal purchase of the appellant from the original devisees of Daniel Diamond, and each party must make out his title to the interest claimed by him by the deeds and other written evidence of title exhibited by them.

In behalf of the appellee it may not be necessary to question the right of the appellant to three-fifths and one-fourth of another fifth of said land although his title to the same is extremely vague, imperfect and in part wholly unproved. But as to the remaining fifth and three-fourths of a fifth it is insisted that the appellee shows a clear, legal title, and that the same is not affected by any equity successfully asserted on behalf of the appellant.

The appellee claims one-half of one-fifth of the land under the deed from Westall Barnes and Margaret his wife, dated 21st of December, 1855. It plainly conveyed that interest to him. It was duly acknowledged by both grantors and the acknowledgement certified as required by the statute. The female grantor Margaret was one of the two surviving children of Henry Diamond, who inherited from him his fifth of the land devised to him by his father Daniel Diamond, and her deed therefore made with the concurrence

of her husband passed to the appellee her half of this fifth. The claim therefore to the half of this fifth is plainly indisputable.

The other half of the fifth decreed to the appellee is claimed under the deed (the first deed) from Samuel Smilie and wife to him, dated 6th of December, 1855, and Smilie claimed the same under a deed from Wm. H. Bowell and Hannah his wife, dated 5th of December, 1855. The female grantor Hannah was one of the two surviving children of Jane Barnes, who was a daughter of the testator Daniel Diamond, and to whom by a codicil to his will he gave the share of his estate which would otherwise have fallen to their mother. The other three children of Jane Barnes had died in infancy, unmarried, childless and intestate. For the appellee therefore it is claimed that as the estate was derived from their grandfather, upon the death of the three who died in infancy, it passed to the two surviving children on the part of the grandfather, Anne and Hannah, and did not descend to their father James Barnes as their heir at law. Code of Va., chap. 123, §9, p. 579. Upon the true construction of the statute it seems clear that an estate derived from a grandfather is as much within the statute as an estate derived from the father. The reason would be the same in both cases, and it is submitted that the former case is as clearly within the equity of the statute as the latter is within its terms. By the term "children" in a devise grandchildren are always included. 2 Jarman on Wills, p. 75, *et seq.* By the term "parent" a grandfather should on the same principle *e converso* be held to be included. But it is said that by the devise in the will of the testator Daniel Diamond, to the children of his daughter Mrs. Barnes, only the children who were born at the death of the testator would take, and that those born afterwards would be excluded. It is a question of the intention of the testator, and it is submitted that it was not the intention in this case to confine the devise to those of the children who happened to be in life at the death of the testator. The property was not to be divided until the death of the testator's wife Christianna. She survived

the testator and for ought that appears in the record, and indeed the record fairly proves that all the children of Mrs. Barnes were born during her lifetime and before the time when the property was to be divided. The testator in pro- viding for the children of his daughters Catherine Smilie and Jane Barnes uses language which is certainly broad enough to embrace all who should be in life at the time the division of the estate was to be made. He could have no motive and nothing shows an intention on his part to dis- criminate between the grandchildren who might be in life at his death and those born afterwards; and the rule appears to be well settled that where there is a gift to children to take effect after the expiration of a previous estate carved out of the subject, all the children in being at the period of distribution whether born before or after the death of the testator, will take; 2 Jarman on Wills, p. 75, *et seq.*, and cases cited in Notes, 2 Lomax Ex.

The cases of *Martin* vs. *Kirby*, 11 Gratt., 67, and *Hansford* vs. *Elliott*, 9 Leigh, 79, cited by the counsel for the appellant, prescribe the rule for the class of cases to which they apply but they certainly have no application to this case. They relate to the force and effect of words of survivorship on a devise or bequest and the period to which they relate where the testator has failed distinctly to point out the period in- tended. No question of that kind arises here. The plain meaning of the testator was to embrace at least all the chil- dren of his daughters who should be in life when the period of distribution arrived, and when the question should arise who were to take.

It is submitted therefore that Hannah Bowell's right to take as one of the children of Mrs. Barnes cannot be ques- tioned, and that upon the death of the three children of her mother in infancy, the whole fifth passed to her and to her sis- ter and that by her deed to Samuel Smilie, her half of this fifth passed to him.

But we will ask how can the appellant be heard to contest her title? He himself claims this share under her. He produces and relies upon a deed from James Barnes and

wife to himself and his wife, by which Barnes undertakes to convey to him Hannah's share in the land (one-half of one-fifth) *as her guardian.* Having accepted this deed and claiming in this cause Hannah Barnes' share under it, he comes with a very ill grace to say that she had no share and attempt to defeat the deed made by her with her husband W. L. Bowell, after she became of age, to Smilie the vendor of the appellee. So with regard to James Barnes, the father of Mrs. Bowell. He never denied her right to a share in this land. He did not claim that she was excluded because born after the death of Daniel Diamond, nor did he suppose that he took the shares of the infant children that died, in the real estate, though he seems to have claimed their interest in the personal estate. In his deposition he states that he did not consider he had any interest in the land in dispute, and he speaks of a verbal contract made with her for the purchase of her interest in the land in controversy then called the Dunkard land. He doubtless knew that Hannah though born after the death of Daniel Diamond, was born before the death of his widow, the time appointed for the distribution of the estate. And that this was the fact is very clearly to be deduced from what is stated as to the death of old Mrs. Diamond, though the exact time of her death is no where stated in the record. It appears from the deposition of Barnes that she was living until after Smith Smilie (a son of Catherine) left this country, and from the testimony of Roderick, Smith Smilie did not leave the country earlier than 1840. Degarman and James Roderick make it later, but are not precise as to the time. It may therefore be fairly assumed that old Mrs. Diamond was living at least until the spring of 1840, and probably longer. Now it is certain Hannah was born some time before that; she was about twenty years old when she made the verbal sale of her interest to her father, and she was of age and married when she and her husband made the deed for the land in 1855. Clearly therefore she was born before the death of her grandmother and the time for the distribution of the estate.

It is scarcely necessary to say that James Barnes acquired no title to Hannah's interest by this verbal contract made with her when she was under age, and that no title did or could pass from her to the appellant by the deed which he undertook to make for her as her guardian; even the fact that he was her guardian is not proven in the case.

The case of *Armstead* vs. *Dangerfield*, 3 Munf., 20, is referred to by the counsel for the appellant. That case only decided that by a devise to children generally (of the testator) a posthumous child will not be regarded as so included as to prevent it from claiming the benefit of the provisions of the statute in favor of pretermitted children, but it in no manner touches the question arising in this case.

It is submitted therefore that the appellee clearly shows title to one-half of one-fifth of this land under the deed from Westall Barnes and wife, and to another half of one-fifth under the deed of Samuel Smilie and wife of the 6th of December, 1855, (his first deed), conveying the interest of Hannah L. Bowell, constituting together the one-fifth mentioned in the decree and allotted with three-fourths of another fifth to the appellee.

Then as to the remaining three-fourths of a fifth thus allotted. Catherine Smilie, a daughter of the testator Daniel Diamond, and to whose children he gave one-fifth of his estate at the death of their grandmother (his wife), appears to have had six children, two of whom died quite young, leaving four surviving, Samuel Smilie, William Smilie, Jane, the wife of John Dickeson, and Smith Smilie, each of whom was entitled to an interest of one-fourth of a fifth in the land in controversy. By contract dated on the 25th of May, 1846, Samuel Smilie agreed to sell his interest (which was as stated a fourth of one-fifth) to the appellant, and by deed dated the 6th of March, 1847, he subsequently conveyed this interest to the appellant. About this there is no controversy, as the appellee does not claim Samuel Smilie's original interest of one-fourth of a fifth in the land, but concedes that to the appellant. But sometime afterwards, Samuel Smilie purchased the interest of his brother William, (being his

fourth of one-fifth and the third of one-fourth of a fifth, being his share of Smith Smilie's part,) and the same was conveyed to him by deed, dated 30th of May, 1848. This deed does not appear to have been copied into the record, but is sufficiently stated in commissioner Berkshire's report. Subsequently, Samuel Smilie purchased the interest of his sister Jane Dickeson in the fifth given by the testator to their mother's children, and the same was regularly conveyed to him by John Dickeson and Jane his wife, by deed bearing date on the 7th of December, 1855. The interest conveyed is described as one-third of one-fifth, and such it really was. For Smith Smilie had, it seems, left the country sometime in or after 1840, and was heard of shortly afterwards in Kentucky. He does not appear to have been heard of after the year 1840, and the legal presumption therefore is that he was dead when William Smilie conveyed all his interest to Samuel Smilie in 1848. So that Samuel Smilie by the deed from William acquired William's fourth of the fifth given to Catherine Smilie's children and his third of Smith's fourth which passed to him by descent on Smith's death, and by the deed of Dickeson and wife he acquired Mrs. Dickeson's fourth and her third of Smith's fourth acquired by descent, and having himself acquired title by descent from Smith Smilie to the other third upon Smith's death, when he conveyed his entire interest in the land to the appellee by the deed of the 8th of December, 1855, he conveyed the entire three-fourths of one-fifth thus acquired by him, after his contract for the sale of his interest, to the appellant of the 25th of May, 1846.

It cannot be said that when Samuel Smilie sold his interest in the land to the appellant by the contract of the 25th of May, 1846, he sold anything more than his own original fourth of a fifth held by him under the devise in the will of Daniel Diamond to the children of Catherine Smilie. That was all the interest he had at that time. He had not then purchased his brother William's or his sister Mrs. Dickeson's shares. These were both acquired after his sale and conveyance of the interest he then had to the appellant, nor

was he then the owner by descent of a third of his brother Smith Smilie's fourth. Smith Smilie so far as the record shows was then living. When he died is nowhere shown. He was certainly living in 1840, and no presumption of his death can be raised until the end of the year 1847. This was after Samuel Smilie's sale and conveyance to the appellant, and his share of Smith's part was not then acquired by descent and did not therefore pass to the appellant; but it was before William Smilie's and Mrs. Dickeson's deeds to Samuel, and consequently their shares of Smith's part did pass to Samuel by those deeds and by Samuel's deed to the appellee in 1855, William Smilie's one-fourth of a fifth and his third of his brother Smith's fourth, Mrs. Dickeson's one-fourth and her third of her brother Smith's fourth, and Samuel Smilie's third of his brother Smith's fourth, making them three-fourths of a fifth, passed to the appellee.

It is submitted, therefore, that the appellee as clearly shows title to the three-fourths of a fifth decreed him as he has done to the one-fifth under deeds of Barnes and wife and Bowell and wife. The appellant shows title to one-fifth of the land in controversy under the devise to his wife Elizabeth, who was one of the children and devisees of Daniel Diamond, to one other fifth under the deed from Daniel Diamond, second, a son and devisee of the testator, to half of one-fifth, being Ann Barnes' half, to another half of a fifth, being Daniel thirds', half of his father Henry's fifth, and to Samuel Smilie's fourth of the fifth devised to the children of Catherine Smilie, thus making the three-fifths and the fourth of another fifth decreed to the appellant. The appellee does not controvert the interest thus decreed to the appellant; but the appellant contends that though the appellee may show the legal title in him to the one-fifth and the three-fourths of another fifth decreed him, yet that as to part of the interest, he has a better equitable title, and he relies on the pretended verbal purchase which he made of the devisees of Daniel Diamond, shortly after the death of the testator, and upon the contract and deed of Samuel Smilie before referred to, the deed from James Barnes and

wife for their daughter Ann's share (one-half of one-fifth), and for the share of their daughter Hannah, afterwards Hannah Bowell's share, being one-half of a fifth, and a title bond from William Smilie and Jane Smilie for their two-fourths of the fifth devised to Catherine Smilie's children. As to the pretended verbal purchase it is not deemed necessary to add anything to what has been already said concerning it. It is wholly unsupported by proof, is utterly improbable, and is in fact fully explained by the testimony, and if there had been proof of it, it is certain no notice of it is brought home to the appellee when he made his purchase.

As to the deed of Samuel Smilie, it has been shown that that deed only conveyed one-fourth of a fifth (Samuel's one-fourth), and the appellant's claim to that is not controverted.

As to the deed from Barnes and wife, it need only be said that appellants claim to Ann's share is not controverted, but that that deed purporting to be made by the guardian of Hannah for her share, can be the foundation of no claim, either at law or in equity.

As to the title bond of William and Jane Smilie it is to be observed though called exhibit "B," it was not filed with the answer, nor is it anywhere found on the record. It seems to have been shown to commissioner Berkshire, but was not left with him nor returned by him with his report. We do not know whether it was proven, or how, or anything more of it than what is stated in the report. But if it were produced and proven, no notice of its existence is brought home to the appellee at the time of his purchase. It is true the commissioner reports that he knew the appellant held possession of the land, but this cannot be regarded as evidence of the particulars of his claim. It was known that the appellant had various interests in the land, amounting to upwards of three-fifths of the whole, and his possession was entirely consistent with his admitted claims. To charge him beyond these, notice of the alleged equitable claims must be brought home to the purchaser, and this it is submitted is not done by the proofs in the case. The circuit court pro-

nounced against the existence of any such proof, and it is submitted, rightly.

As to the complaint of error in decreeing to the appellee his shares of the land according to quantity and quality at the date of the decree, it need only be said, that if the appellant claimed compensation for any improvements he would have to submit to an account also of rents and profits. He asked for no such account in his answer nor did he ask for it at the time the commissioners were directed to make partition; and when the report of the partition was returned he took no exceptions to the partition as made. It is quite too late for him to complain now of this in this court.

The court will observe that by the decree for partition, one-third of one-fifth is assigned to the appellee for the life of Mrs. Corothers, who was the widow of Henry Diamond, a son and devisee of the testator, and the other third to the appellant, when the final decree was pronounced Mrs. Corothers had died, so this life estate was out of the way, and the court is therefore relieved from any necessity of tracing its origin, and how transferred, and may regard it as entirely out of the case.

. Upon the whole case, considering the intricacy and obscurity of the title in question, and the diverse and conflicting interest involved, it is submitted that the decree of the circuit court has reached the substantial justice of the case as nearly as it is possible for human wisdom to attain, and that it should be affirmed.

MAXWELL, J.    Daniel Diamond was the owner of a tract of about 714 acres of land, situate in Monongalia county, which by his will he devised to his three children Daniel Diamond, Henry Diamond, and Elizabeth Cosgray, and to the children of his daughters Catherine Smilie and Jane Barnes.    The will was admitted to probate on the 23rd day of January, 1827.    It does not appear when the testator died, but it must have been a very short time before that day as there is a codicil attached to the will bearing date on the 8th day of December, 1826.

Not long after the will was admitted to record Ignatius Cosgray, the husband of Elizabeth Cosgray, took possession of the said tract of land and has continued to hold the same by himself and his tenants ever since.

Michael Core, the appellee here, claiming to have purchased divers interests in the said land, brought his suit against Cosgray and others to have the same partitioned.

The bill claims one-fifth, one-fourth of one-fifth, one-half of one-fifth and one-third of one-fifth of said land, and charges that all the rest of the land belongs to Cosgray in his own right and in right of his wife.

Cosgray insisted that Core had no interest in any part of said land. The court below by its decrees gave to the said Core one-fifth and three-fourths of one-fifth of said land. From these decrees Cosgray has taken this appeal.

As Core claimed certain interests in the tract of land, and admitted that all the other interests belonged to Cosgray and wife, it is only necessary to ascertain whether or not Core had any interest in the said land, and if so, what is it.

Core claims one-half of one-fifth of said land under a deed from Westall Barnes and Margaret his wife. Henry Diamond had two children at his death, of whom the said Margaret was one, so that Core by this deed does get one-half of one-fifth of said land.

Catherine Smilie had six children living at the death of the testator, by name, Jane, who married John Dickeson, Samuel, Smith, William, Richard and Christianna. Richard and Christianna died in the fall of 1833. Smith left the country and was last heard of in the spring of 1840, so that the presumption of law is that he was dead in the spring of 1847. Richard Smilie, the father, and Catherine, the mother of these children, were both dead before the year 1845. It nowhere appears at what time the widow of Daniel Diamond died.

Core has two deeds from Samuel Smilie and wife, under which he claims one-third of one-fifth of said land, which he, the said Core, claims the said Smilie had a right to convey as one of the living children of Catherine Smilie.

These deeds do not pass to Core any interest of the said Samuel to the said land as one of the children of the said Catherine. Samuel Smilie and wife on the 6th day of March, 1847, had conveyed all his interest to Cosgray, of which Core had full notice at the time he received the deeds. The interest that Samuel had and conveyed to Cosgray was one-third of one-fifth, the presumption of law being that his brother Smith Smilie was then dead.

It is claimed also that by these deeds from Samuel Smilie and wife, Core got the interest of John Dickeson and Jane his wife, who was a daughter of Catherine Smilie. Jane Smilie, before her marriage with Dickeson, by her conveyance, bearing date March 6th, 1847, sold and conveyed her interest in the said land to Cosgray, but the conveyance was not recorded. After her marriage she and her husband conveyed their interest in the land to the said Samuel Smilie, who undertakes to convey the same to Core.

Cosgray was in the actual possesssion of the said land by himself and his tenants claiming it as his own from long before the conveyance to him from Jane Smilie up to, at the time of, and since the conveyances from the said Jane and her husband to the said Samuel Smilie and from him to the said Core, under which Core claims her interest. Core knew at the time he received this conveyance that Cosgray was in possession of the land claiming the whole of it; so that Core cannot by these conveyances get any title from the said Jane and husband.

It is claimed that these deed from Samuel Smilie also pass the title of William H. Bowell and Hannah his wife, who was a daughter of Jane Barnes, in the land to Core. Samuel Smilie has a deed from Bowell and wife for their interest in the said land, bearing date the 5th day of December, 1855. What was their interest at the time of this deed?

Jane Barnes had two children living at the death of the testator and three born afterwards, as I suppose during the lifetime of the testator's widow, though it does not clearly appear at what time she died. Jane Barnes and her husband are still living.

Three of the children of Jane Barnes died after the testator and before the date of this conveyance to Samuel Smilie by Bowell and wife. How did their interest descend? They died without children and unmarried, so that their father is the person to whom their interest in the land descends. This will leave the interest of the said Bowell and wife at the time of their conveyance one-fifth of one-fifth of the said tract of land, which passed to the said Samuel Smilie and which by his deed passed to Core.

In this manner we trace to Core title to one-half of one-fifth and one-fifth of one-fifth of said tract of land, instead of one-fifth and three-fourths of one-fifth of said tract of land given to him by the decrees of the court below. So that in this the court below erred.

The defendant below, Cosgray, is entitled to all the rest of the land, either in fee, in his own right, or as tenant for life in right of his wife. The wife of Cosgray died pending the suit, and her heirs, who are his children, were made parties defendant, and the court undertook to determine as between the defendants their respective rights and interests and made partition between them wholly unasked by any of them. I think this was an error.

I think the decrees should be reversed with costs, and the cause remanded with instructions to the court below to lay off and assign to the said Core one-half of one-fifth of said tract of land in quantity and quality which he is entitled to under the conveyance from Westall Barnes and wife, and one-fifth of one-fifth of said tract of land in quantity and quality, which he is entitled to under the conveyance from William H. Bowell and Hannah his wife, and that the residue of the said land be assigned to the said Ignatius Cosgray in fee simple in his own right and as tenant for life in right of his wife, according to his respective interests therein as aforesaid.

The President concurred.

DECREE REVERSED.