# CHARLESTON.

ELLISON v. TORPIN et al.

Submitted September 16, 1897—Decided March 26, 1898.

1. POSSESSION—*Notice—Purchaser.*
   Possession as notice to purchaser. (p. 436).

2. POSSESSION—*Notice—Purchaser.*
   Is possession notice to purchaser where occupant claims under several written rights and only one is recorded. (pp. 425, 430, 436.)

3. Purchaser—*Quit Claim Deed—Purchaser Bona fide.*
   Can purchaser under quit claim deed be a purchaser *bona fide?* (pp. 427, 431, 445).

4. Specific Performance—*Purchase Money—Lapse of Time.*
   Will specific performance be decreed on mere presumption of payment of purchase money from lapse of time in absence of proof of actual payment? (pp. 427, 433, 447).

5. Notice—*Proof of Notice—Prior Purchaser.*
   Amount of proof to fix notice on purchaser of a prior purchaser's right. (p. 444).

Appeal from Circuit Court, Logan County.

Action by J. B. Ellison against Richard Torpin, Jr., and others. Judgment for plaintiff. Defendants appeal. Affirmed by divided court. English and McWhorter, Judges, for affirming. English, Judge, prepared an opinion, in which McWhorter, Judge, concurred and filed a note. Brannon, Judge, being of opinion that the decree should be reversed, prepared an opinion, in which Dent, Judge, concurred.

*Affirmed by divided Court.*

E. Spencer Miller, Maurice G. Belknap, J. B. Wilkinson, and Campbell, Holt & Campbell, for appellants.

John A. Sheppard, Vinson & Thompson, H. K. Shumate, and McWhorter & Loewenstein, for appellee.

English, Judge:

Jacob Cline, Sr., was the owner of a tract of land situated in Logan County, Va., now in Mingo County, W. Va., which was supposed to contain five thousand acres, and was conveyed to him by one John Lawson. A portion of this tract was situated on Tug river, just above the mouth of Grapevine creek, and was known as the "Old Home Place." The remainder of the boundary is situated on Grapevine creek and Tug river. In March, 1858, said Jacob Cline, Sr., made and published his last will and testament, which was probated and recorded in Logan County, Va., in 1858, by the seventh clause of which he gave to his sons, Perry and Jacob Cline, a tract of land in Logan county, on Tug river, bounded as follows, to wit: "Begin-

ning at two maples about one-quarter of a mile above the mouth of Grapevine creek; thence out to the top of the ridge, to the river at the lower end of his land on said Tug river, including all the land he held on the river, with said lines up Grapevine creek; all he held on said creek, including below said lines,—to Perry and Jacob Cline in coparcenary, to them and their heirs, forever." By the ninth clause of said will he gave to his son Perry Cline a tract of land on Tug river, in Logan County, Va., described as follows: "Beginning at two maples standing about one-quarter of a mile above the mouth of Grapevine creek; thence running up the river, including all the land he held on the river up to Jackson Mounts' line to him and his heirs, forever." In 1870 or 1871, Perry Cline traded all the lands devised to him by his father to one Anderson Hatfield for lands on the other side of Tug river, in Pike County, Ky., and said Hatfield, who had been cutting timber as a trespasser, and building cabins on said Grapevine creek, claiming some sort of title under a survey made by his father, left Grapevine creek, and moved to the old home place, where he lived until 1888, when he and his sons sold all the lands they had to the appellants, and moved away. In order to carry into effect this exchange of lands, said Cline and wife, on March 23, 1877, executed to said Anderson Hatfield a deed by which they conveyed all the lands willed to Perry Cline by his father, located on Tug river, in Logan county, including the home place and Perry Cline's interest in the Grapevine lands. In 1879, Jacob Cline, Jr., died intestate, leaving two sons, to wit, P. A. Cline, Jr., and Wayne Cline, who were then infants. On January 30, 1888, Anderson Hatfield and his two sons and their wives conveyed to J. D. Sergeant, who conveyed afterwards to the appellants, trustees, etc., five small boundaries of land, aggregating one thousand five hundred acres, the description of which tracts of land in said deed concludes as follows: "All of the real estate herein conveyed being part of a five thousand acre survey conveyed from A. P. Cline to said Hatfield, Sr., by deed bearing date on the 23d day of March, 1877." And when we refer to a copy of said last-named deed, which is made part of the record, it is perceived at once that by that deed P. A

Cline only conveyed to Anderson Hatfield, Sr., the lands which were willed to him by his father, Jacob Cline, Sr., which a reference to a copy of said will in the record shows includes a moiety of the lands on Grapevine creek belonging to said Jacob Cline, Sr., in his lifetime, showing a clear and manifest intention to embrace no more than the home place, and P. A. Cline's undivided moiety of the Grapevine lands, in the deed of conveyance to said Sergeant.

With the records of Logan county in this condition, and the land books showing that the land in controversy had been charged, in the name of Jacob Cline's heirs, with taxes as five thousand acres, until 1884, when two thousand nine hundred acres, part thereof, composed of the home place and P. A. Cline's half of the Grapevine lands, were charged to Anderson Hatfield under his deed from P. A. Cline of March, 1877, placed on record in 1882, the plaintiff, J. B. Ellison, went to Anderson Hatfield, Sr., in order that there might be no mistake, and asked him if he had ever bought Jacob Cline's interest in the Grapevine lands, and was informed that he had not. Having thus been satisfied that the undivided moiety of the Grapevine lands yet belonged to the heirs at law of Jacob Cline, Jr., (who died in 1879 intestate, leaving two sons, P. A. Cline, Jr., and Wayne Cline), the appellee, J. B. Ellison, met the said P. A. Cline, Jr., and Wayne Cline, at their home in Kentucky, on December 6, 1893, and purchased from them the undivided moiety of said Grapevine lands devised by Jacob, Sr., to their father, and paid them one hundred dollars each for their respective interests, taking from them deeds and covenants of special warranty, which were joined in by their mother, and duly recorded. With the title of these heirs on record, said Ellison, on February 27, 1894, instituted this suit in the circuit court of Logan county against said trustees and others, claiming to be the owner of the Jacob Cline moiety of the Grapevine lands, and praying that the lands embraced in the seventh clause of the will of Jacob, Sr., might be partitioned, and one-half thereof assigned to him, and the other half to the defendants entitled thereto.

On the 19th of June, 1894, said trustees filed their joint

and separate answer, admitting that Jacob Cline, Jr., was in his lifetime the owner of a moiety of Grapevine lands under his father's will, but denying the legitimacy of said P. A. Cline, Jr., and Wayne Cline, who conveyed their interests to said Ellison, and attempting to allege a sale by Jacob Cline, Jr., of his moiety of said lands in his lifetime; which allegation was stricken out of the answer by the court for indefiniteness, as it failed to allege the terms of sale, the name of the purchaser, or whether the same was oral or in writing. The plaintiff replied generally to the modified answer, and depositions were taken establishing the fact that P. A. Cline, Jr., and Wayne Cline, the grantors of Ellison, were the lawful heirs of Jacob Cline, Jr., and on January 4, 1895, the trustees tendered and filed an amended answer, denying the plaintiff's (Ellison's) title to the Jacob Cline moiety of the Grapevine lands; and alleging, a new matter, a parol sale by Jacob and P. A. Cline of said lands in 1869, subsequently reduced to writing, exhibiting the title bond dated August 24, 1869, as such writing, the delivery of possession, and the payment of purchase money; and, by way of affirmative relief, prayed that the plaintiff, Ellison, be held as trustee holding the legal title for them, and that he be compelled by the court to convey the same to them. The plaintiff filed a special replication to this answer, denying the parol sale and title bond alleged in said amended answer, and alleged that the title bond, if genuine, was never recorded, and claiming that he was a purchaser for value, without notice of said title bond, and that the same was void as to him, under section 5 of chapter 74 of the Code. Depositions were taken by both the plaintiff and defendants, and on August 3, 1895, a decree was rendered denying the prayer of the defendant trustees for affirmative relief, holding that the plaintiff, Ellison, was the owner in fee of the Jacob Cline moiety of the lands devised by the seventh clause of Jacob Cline, Sr.'s, will, and directing a partition of the same between the plaintiff and the defendants; and from this decree the trustees applied for and obtained this appeal.

The appellants in their petition for appeal claim that the circuit court erred in refusing to remove this cause to the circuit court of the United States for West Virginia on

their application, they being citizens and residents of the state of Pennsylvania, and the plaintiff a citizen and resident of the state of West Virginia, and the controversy, as between them, related wholly to that part of the land claimed by appellants, and in which controversy the co-defendants had no interest; hence the controversy was separable, and should have been removed. This assignment, however, is not insisted upon by the appellants in their briefs, and no reason is assigned by them for sustaining the same, and, as we see no error in the action of the court in this respect, this assignment must be considered as waived and abandoned.

The second assignment of error relied on by the appellants is that the court erred in its decree of August 3, 1895, in adjudicating that the plaintiff is the owner in fee of an undivided moiety of the land mentioned in the bill, and in decreeing a partition accordingly, and in refusing to compel the plaintiff to convey to appellants an undivided moiety of that part of said land claimed by them, in specific performance of the title bond set up in their answer. The controversy in this case is in regard to the ownership of the tract of land devised by the seventh clause of the will of Jacob Cline, Sr., to his sons, Perry and Jacob, known as the "Grapevine Tract." This land is claimed by the appellants by virtue of a deed executed by P. A. Cline and wife to Anderson Hatfield, dated March 23, 1877, which deed described the property conveyed as "all the land that was willed to P. A. Cline by Jacob Cline, Sr., his father, said land being and lying on Tug river, in Logan County, W. Va., containing 5,000 acres more or less;" and by a subsequent deed dated January 30, 1888, from Anderson Hatfield and wife and certain ones of his children to whom he had conveyed portions of said tract, which deed purports to convey several tracts of land, aggregating one thousand five hundred acres, and closes with the following general description : "All of the real estate herein conveyed being a part of a 5,000-acre survey conveyed from P. A. Cline to said Anderson Hatfield, Sr., by deed bearing date on the 23d day of March, 1877." Afterwards said Sergeant conveyed to the appellants, trustees. These deeds are their title to these lands from P. A. Cline, and they embrace no

more than P. A. Cline's undivided moiety in the Grapevine tract and the home place.

It is claimed by counsel for the appellants that the appellee, J. B. Ellison, was not an innocent purchaser of the moiety of the Grapevine lands willed to Jacob Cline, Jr., by his father, and that, if he did not have notice of the existence of the title bond exhibited with the amended answer of said trustees, he was put upon inquiry by the possession of Anderson Hatfield, and in consequence thereof he was chargeable with notice of the equitable title of Anderson Hatfield derived by virtue of said title bond.

Now, suppose that the possession of said Anderson Hatfield, instead of being, as the evidence shows it was, by the erection of a cabin here and there to shelter his hands while logging, by no means exclusive or continuous, had been such as to put the plaintiff upon inquiry ; what more inquiry could he have made than he did before purchasing said moiety from P. A. Cline, Jr., and Wayne Cline ? He says in his deposition (and it is uncontradicted), in answer to question 12 : "Did you ever have a conversation with Anderson Hatfield, Sr., about the Jacob Cline one-half of of the Grapevine lands; and, if so, what was it ?" "I did. I asked him if he had ever bought Jacob Cline's interest in the Grapevine lands, and he told me that he did not. This was before I bought the land." What more could he have done ? He had gone to the man who, of all others, ought to have known whether he had bought the land or not, and he had been informed that he had not purchased it. See 16 Am. & Eng. Enc. Law, 805, where the law upon this point is stated thus: "When a purchaser has been put upon inquiry by the possession of a tenant, and upon making inquiry receives information as to the tenant's claim, he may rely on such information, in the absence of anything to give notice of its falsity." And, while I am discussing this question of notice, it may not be improper just here to call attention to the fact that the last will and testament of Jacob Cline was admitted to record in Logan county in April, 1858, and by reference to that the purchasers from P. A. Cline of the lands willed to him by his father could easily have seen that he only derived thereby a moiety of the Grapevine lands, the other half going to

Jacob Cline, Jr.; and yet the deed from P. A. Cline and wife to Anderson Hatfield, Sr., only conveys all the land that was willed to P. A. Cline by Jacob Cline, Sr., his father; and the deed from Anderson Hatfield, Sr., and his sons, to J. D. Sergeant, who afterwards conveyed to the trustees, describes the land thereby conveyed as part of a five thousand-acre survey conveyed from P. A. Cline to said Anderson Hatfield, Sr., by deed bearing date the 23d day of March, 1877, referring to said deed from P. A. Cline and wife to Anderson Hatfield, Sr., for description. It is true the appellants in their amended answer allege that prior to the 7th day of May, 1869, (the date of said title bond), said Jacob Cline and Perry A. Cline bargained and sold all the land devised to them jointly by their father to the defendant Anderson Hatfield, for the price of five hundred dollars, and that said Perry A. Cline and Jacob Cline, pursuant to and in part execution of said parol contract so made, delivered to said Anderson Hatfield the possession of said land so sold, and that said Hatfield in part execution of said contract received, and thereafter continued to hold, the possession so delivered till his subsequent sales thereof ; and they ask, by way of affirmative relief, that the appellee, J. B. Ellison, be declared a trustee holding the legal title to said moiety of land for the use of appellants, and that he be compelled to convey to them in specific performance and execution of the contract of purchase by Hatfield from Jacob Cline and Perry A. Cline, devisees as aforesaid.

Now, if there had been such a parol contract between Anderson Hatfield, Sr., and Jacob and Perry A. Cline, as is claimed in such amended answer, we can but regard it as exceedingly remarkable that Anderson Hatfield should, on the 23d day of March, 1877, accept a deed from P. A. Cline and wife for the land that was willed to P. A. Cline by his father, which description would only include a moiety of the Grapevine lands, and that the entire consideration in the shape of a tract of land on Tug river, Pike County, Ky., should be paid to P. A. Cline ; and it is equally strange that the appellants, with the records before them, if they thought they were acquiring Jacob Cline, Jr.'s, interest, should have accepted a deed only for

P. A. Cline's half thereof.   It is difficult to perceive what
right the appellants have shown by the record to demand
a specific performance of the alleged contract between
Anderson Hatfield, Sr., and Jacob Cline, Jr., whether said
contract was by parol or in writing, even if the parol
contract was proven beyond controversy, and there was no
question in regard to the acts of part performance in pur-
suance thereof, and the due and proper execution of the
title bond was established beyond controversy.   I make
this assertion because there is nothing in the record which
shows, or attempts to show, a transfer from Anderson
Hatfield, Sr., of Jacob Cline's interest in the Grapevine
lands, under his father's will, to the appellants or any one
for them.   Anderson Hatfield does not appear to have as-
serted any such claim to the Jacob Cline interest himself,
nor to have assigned or conveyed any such interest, di-
rectly or indirectly, to the appellants.   The appellants
have, however, seen proper to champion the cause of An-
derson Hatfield, and assert his right to the Jacob Cline
interest in said lands, and, as we have seen, claim that
Hatfield had a parol contract with Jacob Cline for said
moiety, and, in order to relieve said contract from the ef-
fect of the statute of frauds, claim that Hatfield took pos-
session of the land in part performance of said parol
contract.

Upon this question, Browne on the Statute of Frauds
(section 476) thus states the law:   "Fourthly, the posses-
sion must appear to have been delivered or assumed in
pursuance of the contract alleged.   And this is but a parti-
cular application of the general rule, heretofore noticed,
that the acts relied on as part·performance must be such
as would not ordinarily have been done unless a contract
had been entered into between the parties."·   Also in sec-
tion 477, where it is said:   "Thus it is abundantly settled
that, if one who is already in possession of land as tenant
verbally contract with the owner for a new term, his mere-
ly continuing in possession after the making of the alleged
contract is not an act of part performance, within the
meaning of the rule, so as to justify a lease according to
the contract.   In such a case the continued holding is
naturally and properly referable to the old tenancy, and

does not necessarily imply any new agreement between the parties. The same reasoning applies, of course, where the contract set up is the sale of the estate to the defendant by the owner in fee.

Now, when we turn to the testimony upon.this point, it will be seen that the witness G. W. Taylor, in response to the eleventh question on cross-examination, when asked, ''Under what claim of title did Anderson Hatfield move on Grapevine creek and take possession?" answered: "Under the claim of his father, Ephraim Hatfield, father of Anderson Hatfield, by a survey that he claimed that his father had made there on the creek." And when, in the next question, witness was asked, "Was there any dispute or trouble between Hatfield and Jacob and Perry Cline?" he answered, "Yes, sir, there was; each party claimed it." In answer to another question, said witness stated that Anderson Hatfield was in possession of said land in the year 1866. Joseph Simpkins, witness for appellants, also, in answer to question 4 on cross-examination, stated, when asked under what claim of title Anderson Hatfield occupied Grapevine creek, that "in the year 1860 he went there under a title of his father, and then in the year 1867 he moved back there, and then in the year 1868, as near as I remember, he purchased the lands from P. A. and Jake Cline."

Thus, the testimony in the cause shows that said Hatfield did not go into possession of the Grapevine lands in pursuance of any parol contract with Jacob or Perry Cline. Upon this point Fry on Specific Performance (section 387) states the law thus: "To make the acts of part performance effective to take the agreement out of the statute of frauds, they must be such as cannot be referred to any other title than such an agreement as that alleged, nor have been done with any other view or design than to perform such an agreement." Browne on the Statute of Frauds (section 454) says: "Another general rule in regard to the acts relied upon is that they must appear to have been done in pursuance of the contract alleged. To use the language of Lord Hardwicke, 'It must be such an act done as appears to the court would not have been done except on account of the agreement,'"—citing *Lacon* v.

*Mertins*, 3 Atk. 3, 4; "or, as it is expressed by Sir William Grant, 'It must be an act unequivocally referring to and resulting from the agreement,'"—citing *Frame* v. *Dawson*, 14 Ves. 386, and numerous other authorities.

It is, however, claimed that the possession of Anderson Hatfield, Sr., was sufficient to put the appellee upon inquiry. Conceding, however, that such was the case, as we have said before, he did make inquiry; and on going to Hatfield, who, of all men, would be supposed to know whether he had purchased Cline's interest in the Grapevine lands, was informed by him that he had not, and from the deed he made to Sergeant he does not appear to have sold said interest. The defendants in their amended answer allege that Perry A. Cline on March 3, 1877, conveyed his interest in said lands to Anderson Hatfield, but that Jacob Cline departed this life before completing said contract by conveying his interest in said lands to Hatfield; that subsequently the land sold as aforesaid by Jacob and Perry Cline to Hatfield, by a succession of sales and conveyances from said Hatfield and his vendees, became and was vested in appellants as trustees. This statement is not supported by the record, for the reason that Perry Cline by his deed to Anderson Hatfield dated March 23, 1877, only conveyed the land that was willed to him by his father, and no other land than that was conveyed to Sergeant by Hatfield, and by Sergeant to the appellants. Now, from the paper purporting to be a title bond from Perry A. Cline and Jacob Cline to Anderson Hatfield, which was found by an agent of the appellants among the private papers of Anderson Hatfield tied up in an old shawl, more than twenty years after its date, it appears that at the time J. B. Ellison purchased the moiety of Jacob Cline in the Grapevine lands from his heirs at law the parol contract alleged and relied on in said amended answer had, for more than twenty years, been merged in the title bond witnessed by G. W. Taylor and Robert Mounts, which was susceptible of recordation, but which, remaining unrecorded, was void as to the purchase made by said Ellison, under sections 4 and 5 of chapter 74 of the Code.

Returning again to the question as to the effect of possession as notice to a purchaser, this Court has stated the

law in the case of *Campbell* v. *Fellerman's Heirs*, 20 W.
Va., 398 (sixth point of syllabus): "A person in posses-
sion of real estate is sufficient notice to a purchaser, con-
tracting with a claimant of such real estate not in posses-
sion, to put him on the inquiry; and if he takes a convey-
ance from such claimant he will be charged in favor of the
person so in possession with all the information such in-
quiry would have given him if diligently pursued." This
states correctly the general rule; but to this rule there
are exceptions. Let us now revert to the fact that on
March 23, 1877, P. A. Cline and wife conveyed to Ander-
son Hatfield his moiety of the Grapevine lands, which
deed was recorded the 30th day of August, 1882, and that
Anderson Hatfield and his sons conveyed a part of said
land to J. D. Sergeant on the 30th day of January, 1888,
which deed was recorded on the same day, and thus the
status of the title was shown by the record on the 6th day
of December, 1893, when J. B. Ellison purchased the Jacob
Cline interest from P. A. Cline, Jr., and Wayne Cline.
Now, it was held in the case of *Smith* v. *Yule*, 31 Cal.
180–183, that inquiry does not become a duty where the ap-
parent possession is consistent with the title appearing of
record. The subsequent purchaser cannot be said, in such
case, to have either neglected or refused to make inquiry
for a title not appearing of record, for none was suggested
by the apparent possession, and, therefore, for his failure
he cannot be adjudged guilty of fraud. Where the vendor
is in apparent possession, the subsequent purchaser, find-
ing the title of record in the vendor, is put upon no further
inquiry, because the possession appears to be according
to the title ; and if at the same time another person is also
in possession there is no presumption of title in him in-
consistent with that fraud in the vendor. In the case at
bar, Hatfield, by recording his deed of the 23d of March,
1877, gave notice to the world of the extent of his interest
in the Grapevine lands, and thereby restricted the legal
effect of possession as notice to purchasers to the interest
in said lands described in his deed. See *Eshbach* v. *Zim-
merman*, 9 Pa. St. 317, where it is held that notice of title
given by possession is restricted by registry by the ten-
ant of the evidence of any particular title to notice of that

title. Again, is the case of *Woods* v. *Farmere*, 7 Watts, 382, Chief Justice Gibson, delivering the opinion of the court, said: "In Pennsylvania every written title may be registered, and, where an occupant announces but one of his titles, he does an act which for its tendency to mislead ought to postpone the other. By exhibiting a conveyance to which, by his own showing, his possession may be referred, he does what he can to turn a purchaser from the direct path of inquiry. The party for whose protection registration is intended would be more misled by the use of it than if the occupant had pointed to his possession alone, as that would have led him to a particular examination of it; and when the occupant, therefore, points the attention of the public to a particular conveyance by the register he abandons every other index." In support of this proposition, see Wade, Notice, §§ 297, 298.

Anderson Hatfield by placing his deed from P. A. Cline and wife on record on August 30, 1882, gave notice to the world as to what portion of the Grapevine lands he claimed; and J. D. Sergeant, by placing on record the deed from Anderson Hatfield and his sons, dated January 30, 1888, gave notice that he only claimed thereby part of the land conveyed by P. A. Cline and wife to Anderson Hatfield by said deed of March 23, 1877; and neither of these deeds purported to convey the interest of Jacob Cline, Jr., in the Grapevine lands. Now, what entitles the appellants to specific performance of the contract contained in said title bond, be it ever so genuine? The appellants surely could be entitled to no other or further relief in that respect than their grantor, Hatfield, was entitled to, provided he had conveyed or assigned to them his equity in the Jacob Cline moiety of the Grapevine land, which the record nowhere shows that he ever did; but, so far as the record discloses, all claim of said Jacob Cline moiety under said title bond was ignored and abandoned by said Hatfield, and he did not pretend to convey it to Sergeant. See, also, *Kirby* v. *Tallmadge*, 160 U. S. 387, (16 Sup. Ct. 352,) in which the court, after citing *Atwood* v. *Bearss*, 47 Mich. 72, (10 N. W. 112,) says: "Indeed, there can be no doubt whatever of the proposition that where the land is occupied by two persons, as, for instance, by husband and wife, and there

is a recorded title in one of them, such joint occupation is not notice of an unrecorded title in the other. In such case the purchaser finding title in one would be thrown off his guard with respect to the title of the other. The rule is universal that, if the possession be consistent with the record title, it is no notice of an unrecorded title." Now, this Court has held in the case of *Clay* v. *Deskins*, 36 W. Va., 350, (15 S. E. 85), that "a party seeking specific performance by a bill in equity must show himself to have been ready, desirous prompt, and eager to perform the contract on his own part. The unreasonable delay of the purchaser which will prelude a decree for specific performance in his behalf is dependent upon the circumstances of the particular case, and if his conduct has indicated bad faith, or a virtual abandonment of the contract, it will deprive him of all just claim to equitable interposition."

It is claimed by counsel for the appellants that the appellee, J. B. Ellison, holding under a quitclaim deed from P. A. Cline, Jr., and Wayne Cline, cannot be regarded as a *bona fide* purchased for value. This question, however, is discussed in the opinion of Mr. Justice Field in the case of *Moelle* v. *Sherwood*, 148 U. S. 29, (13 Sup. Ct. 426), and in the opinion of Mr. Justice Brewer reported in 148 U. S. 45, (13 Sup. Ct. 458), in the case of *U. S.* v. *California Land Co.* In both of these cases it is distinctly held that a purchaser holding under such a deed can be a *bona fide* purchaser for value.

In order that the appellants should be entitled to a specific performance of the contract claimed to have been made between Anderson Hatfield, Jr., and Jacob Cline, they must first show that such a contract existed, and that they are entitled to the benefit of the same by assignment or otherwise; but neither of these conditions appears from the record to have been complied with. It is said by Fry, in his work on Specific Performance (page 198, § 286), that "a contract to be specifically enforced by the court must be mutual; that is to say, such that it might at the time it was entered into have been enforced by either of the parties against the other of them. Whenever, therefore, whether from personal incapacity, the nature of the contract, or any other cause, the contract is incapable of being

enforced against one party, that party is equally incapable of enforcing it against the other, though its execution in the latter way might in itself be free from the difficulty attending its execution in the former;" and in the note it is said: "No rule in equity is more thoroughly settled than this,"—citing numerous authorities. "A party not bound by the agreement itself has no right to call upon a court of equity to enforce specific performance against the other contracting party, by expressing his willingness in his bill to perform his part of the engagement. His right to the aid of the court does not depend upon his subsequent offer to perform the contract on his part, but upon its original obligatory character." Pom. Spec. Perf. § 285, note, citing *Duvall* v. *Myers*, 2 Mid. Ch. 401, and *Bodine* v. *Glading*, 31 Pa. St. 50.

Now, this record contains no proof of the payment of the purchase money or any part of it by Anderson Hatfield to Jacob Cline for this tract of land, and we may search the record in vain for any right on the part of the said Jacob Cline, his heirs or assigns, to call upon the appellants for any portion of said purchase money. They certainly derived no such right from Hatfield, for the reason that it was his duty to have paid said purchase money, and he does not appear to have conveyed the Jacob Cline moiety of said lands to appellants, or to have transferred any liability of his connected therewith to the appellants.

Again, payment of the purchase money from Hatfield to Jacob Cline will not be presumed from lapse of time. See *Showalter* v. *Hambrick*, 25 S. E. 102, from the court of appeals of Virginia, where it is held that special performance of a contract to convey land brought by one that has been for thirty years in possession of the land under the contract will not be enforced where the evidence shows the consideration for the conveyance has never been paid. So, also, in the case of *Logan* v. *McChord*, 2 A. K, Marsh. 224, it is held that where the consideration is denied plaintiff must show payment before he can have specific performance. "Presumption of payment will not avail a plaintiff who seeks affirmative relief by specific performance of a contract for sale of land." *Brady* v. *Begun*, 36 Barb. 533. See, also, *Bennett* v. *Welsh*, 25 Ind. 140; 18

Am. & Eng. Enc. Law, 208 ; *Morley* v. *Trust Co.*, 14 N. Y., 302. Specific performance will not be decreed against a *bona fide* grantee who has no actual notice of such outstanding equities, (*Ferrier* v. *Buzick*, 2 Iowa, 136; *Bank* v. *Sharp*, 6 How. 303); and in the case of *Carter* v. *Allan*, 21 Grat. 249, Christian, J., in delivering the opinion of the court, says : "It is sufficient to say that it has been the uniform course of decision in this state, as well as in the other states of the Union, to hold that the *bona fide* purchaser of a legal title is not affected by any latent equity founded on a trust, fraud or incumbrance or otherwise, of which he had not notice, actual or constructive. It is equally well settled that the party seeking the aid of a court of equity for relief against a *bona fide* purchaser must allege and prove notice." My conclusion, therefore, is that the appellants have shown no right to the relief prayed for in their amended answer; that the appellee, J. B. Ellison, is entitled to the relief prayed for in his bill; and that there is no error in the decree complained of, and that the same should be affirmed, with costs and damages.

Note by McWhorter, Judge.

I have to dissent from the opinion of Judge Brannon handed down in this case, and concur with the conclusion of Judge English, and add the following note :

The title bond from Perry A. Cline and Jacob Cline to Anderson Hatfield, dated August 24, 1869, which is relied upon by the appellants, since the filing of the amended answer, for their title to the Jacob Cline half interest, was witnessed by two witnesses, and was a recordable instrument under our statutes, and the evidence shows no reason for not recording the same. The record shows, by the affidavits of the trustees and their attorneys, that neither they nor their attorneys knew of the existence of this title bond until long after the bringing of this suit, and the conveyances made by Hatfield all refer back to the recorded deed from Perry A. Cline to Hatfield, conveying only his half interest. But the answer alleges the genuineness of the title bond, and the special replication of the plaintiff denying the bond is not sworn to nor accompanied

by an affidavit denying the same, and its genuineness, under our statute, is not denied.   Code W. Va., c. 125, s. 40. Can Ellison be charged with notice of the title bond when he took the conveyance for half the land from the two sons of Jabob Cline?   The defendants, the title bond being considered as genuine, had under it an unrecorded right to the whole of the Grapevine tract.   They also had a recorded right to the Perry A. Cline undivided half of the Grapevine tract by virtue of the deed from the said Cline to Hatfield dated March 23, 1877.   It is claimed by the defendants that Ellison had notice of their right under the title bond by their possession of the property.   The plaintiff denies that the defendants had possession of the property, and from the evidence shown by the record it cannot be said that the possession was as open, visable, exclusive, distinct, and unequivocal as is necessary to give notice.   As in *Boggess* v. *Meredith*, 16 W. Va., 1, syl. pt. 1:   "An actual ouster of one tenant in common cannot be presumed, except where the possession has become tortious and wrongful by the disloyal acts of the co-tenant, which must be open, continued, and notorious, so as to preclude all doubt of the character of his holding or the want of knowledge thereof by his co-tenant.   This conduct must amount to a clear, positive and continued disclaimer and disavowal of his co-tenant's title, and an assertion of an adverse right, and a knowledge of this must be brought home to his co-tenant."   And *Rust* v. *Rust*, 17 W. Va., 901.

Let us consider the question whether or not Ellison had notice of the defendants' right to the whole of the Grapevine tract by their possession, assuming they were in possession. It is well settled by the best authorities that actual possession is notice to purchasers of the right of the person in possession; but there is also a well-settled exception to this rule, and that is that where a party is in possession of property, and there is a recorded title under which he would be entitled to such possession, then possession is not notice to subsequent purchasers of any unrecorded title, and the possession will not operate to put such purchaser upon inquiry respecting any other title than that which the record discloses.   The defendants

were in possession, and there was a recorded title under which they were entitled to the Perry A. Cline undivided half of the Grapevine tract. A purchaser would therefore be charged with notice of the recorded title, but he would not be charged with notice of the unrecorded title. The defendants have recorded title from Anderson Hatfield and others, and Anderson Hatfield had a recorded title to the Perry A. Cline undivided half of the Grapevine tract. And Ellison cannot be charged with notice of any greater title than the recorded title. Ellison inquired of Hatfield, and was told by him that he never bought Jacob Cline's interest in the Grapevine lands. He was not required to make inquiries at all. It will be contended that the declaration of Hatfield cannot be taken to cast doubt upon the title he conveyed. This would be the case if the defendants were the vendees of Hatfield, however remote, of the Jacob Cline interest, which is not the case. The record shows that none of the appellants knew of the existence of the title bond, and therefore had Ellison inquired of them, he could not have learned of its existence. In *Woods* v. *Farmere*, 32 Am. Dec. 772, the learned judge says: "In Pennsylvania every written title may be registered, and where an occupant announces but one of his titles he does an act which, for its tendency to mislead, ought to postpone the other. By exhibiting a conveyance to which by his own showing, his possession may be referred, he does what he can to turn a purchaser from the direct path of inquiry. The party for whose protection registration is intended would be more misled by the use of it than if the occupant has pointed to his possession alone, as that would have led him to a particular examination of the foundation of it; and when the occupant, therefore, points the attention of the public to a particular conveyance by the registry, he abandons every other index. An exception to this might be the case of possession taken under a parol contract partly executed, which is not susceptible of registration; yet, if it were the title mainly relied on, why register another, when, if neither were registered, the possession would be notice of both?" This principle is found to be well settled by the best authorities. *Smith* v. *Yule*, 31 Cal. 180: "If the apparent possession of land is consist-

ent with the title appearing of record, it is not the duty of the purchaser to make any inquiry concerning the title beyond what the recording office shows." *McNeil* v. *Polk*, 57 Cal. 323; *McMechan* v. *Griffing*, 3 Pick. 149. It is also claimed that the deeds to Ellison from the two sons of Jacob Cline are only quitclaim deeds, and therefore he cannot be considered as a purchaser for value without notice. This deed is not a quitclaim deed, but a deed conveying the land itself. The language of the deed is, "do grant, bargain, sell, and convey unto the party of the second part all their right, title, and interest whatsoever, both at law and in equity, in and to all that certain tract or boundary of land, situate," etc. Another portion of the deed reads: "It is hereby intended to convey a one undivided half interest in and to the said boundary of land," etc. In *Brown* v. *Jackson*, 3 Wheat. 451, the court considered the effect of a deed conveying "all the right, title, and interest" in land, and held that such a deed was sufficient to pass the land itself. Even if this conveyance were a quitclaim deed, it is settled by the authorities that a conveyance by a quitclaim deed does not prevent the vendee from claiming to be a purchaser without notice. Some authorities may be found in which it has been held to the contrary, and in the United States supreme court, in *May* v. *Le Clarc*, 11 Wall. 217, 232, it was held: "A purchaser by a deed of quitclaim, simply, is not regarded as a *bona fide* purchaser without notice." But the supreme court of the United States has overruled itself in *Moelle* v. *Sherwood*, 148 U. S. 21, (13 Sup. Ct. 426), and Mr. Justice Field, in rendering an opinion of the court, says: "The doctrine expressed in many cases that the grantee in a quitclaim deed cannot be treated as a *bona fide* purchaser does not seem to rest upon any sound principle." And in *U. S.* v. *California Land Co.*, 148 U. S. 45, (13 Sup. Ct. 458), the court followed the decision in *Moelle* v. *Sherwood*, and disaffirmed all former contrary decisions. Other authorities holding the same way are *Chapman* v. *Sims*, 53 Miss., 163; *Eoff* v. *Irvine*, 108 Mo., 378, (18 S. W. 907).

As to the consideration paid by Ellison to the two sons of Jacob Cline for their undivided half interest in the Grapevine tract. The amount paid by Ellison to the two

sons of Jacob Cline was two hundred dollars. The fact that the real worth may not have been paid for the property purchased will not prevent a party from being a *bona fide* purchaser for value. He must be a purchaser for a valuable consideration, but it is not necessary that he pay what the land is actually worth. The fact that he buys the land cheap does not prevent him from being a *bona fide* purchaser. It cannot be said that the plaintiff had notice of the existence of a title bond, which the defendants themselves did not know existed, and which appears to have been abandoned and forgotten, and was not a *bona fide* purchaser for value simply because he only paid two hundred dollars for property, even though it be worth what the counsel for the appellants claim it to be worth. In *Pennybacker* v. *Laidley*, 33 W. Va., 624, (11 S. E. 39), the Court considered thoroughly what was inadequate consideration. The appellants in their answer call for affirmative relief, and ask that, "in the event the said Perry A. Cline and Wayne Cline be determined to be legal and sole heirs of the said Jacob Cline, devisee as aforesaid, now deceased, the plaintiff be declared a trustee holding the legal title to the said moiety of land for the use of these defendants and their *cestuis que trust*, and that he be compelled by the decree of this court to convey the same by apt and proper deed, duly acknowledged for record, to them, in specific performance and execution of the contract of purchase hereinbefore set out and entered into between the said Anderson Hatfield and Jacob Cline and Perry A. Cline, devisees as aforesaid, and for all such other and general relief," etc. The appellants ask for a specific performance of the contract between Hatfield and Perry and Jacob Cline upon the part of Ellison, and that he be compelled to convey to them the legal title which is vested in him. Equity will not require the specific performance of a contract when it is denied that the purchase money has been paid, unless the party asking for the specific performance of the contract tender the purchase money or prove that the same has been paid. There is no proof in this case that the purchase money has ever been paid to Jacob Cline for his half interest in this tract of land. The allegation of payment was denied by the special replication of the

plaintiff, and the defendants have at no time tendered the purchase money, and therefore they are not entitled to a specific performance of the contract. *Clay* v. *Deskins*, 36 W. Va., 350, (15 S. E. 85), and the authorities there cited. The first syllabus of the case is: "A party seeking specific performance by a bill in equity must show himself to have been ready, desirous, prompt, and eager to perform the contract on his own part. The unreasonable delay of the purchaser, which will preclude a decree for specific performance in his behalf, is dependent upon the circumstances of the particular case, and, if his contract has indicated bad faith or a virtual abandonment of the contract, it will deprive him of all just claim to equitable interposition." That a contract may be specifically enforced, it must be mutual and binding on both parties. Neither Ellison nor the heirs of Jacob Cline could compel the defendants to pay the purchase money due from Hatfield under the title bond. At no time have the defendants assumed its payment or agreed to settle with any one. The title bond was not signed by Hatfield, nor was he bound to pay the purchase money in any way, and no time was fixed in the title bond when the purchase money should be paid. *Gates* v. *Gamble*, 53 Mich. 181, (18 N. W. 631); *Hawralty* v. *Warren*, 18 N. J. Eq. 124. In the consideration of this case no attention has been paid to the petition of Ellison, containing the affidavits of G. W. Taylor and Anderson Hatfield, both of whom swear that the name of Jacob Cline, signed to the title bond, is a forgery, as this evidence is not properly before the court. This petition, with the affidavits, was filed at the rehearing of the case at Charles Town, and the evidence, if properly before the Court, would prove that the defendants have no title of any kind to the Jacob Cline half interest in this property. The record does disclose the fact that the defendants pretended to be desirous of taking the testimony of Hatfield, only to throw the plaintiff off his guard, and thus prevent his taking it, because plaintiff supposed Hatfield was hostile to his interests, and so succeeded in misleading plaintiff, and kept the deposition of Hatfield out of the case.

Brannon, President:

Jacob Cline, Sr., devised one tract of land, known as the "Old Home Place," lying in formerly Logan county, now in Mingo county, on Tug Fork of Big Sandy river, to his son Perry A. Cline, and another tract, lying on said Tug river and Grapevine creek, containing four thousand to five thousand acres, he devised to his two sons, Perry A. Cline and Jacob Cline; Perry A. Cline being thus the sole owner of the "Old Home Place," and he and his brother, Jacob Cline, joint owners of the "Grapevine Tract," as I shall call it. Perry A. and Jacob Cline sold to Anderson Hatfield the Grapevine tract, and executed a title bond to evidence the sale, dated August 24, 1869. It was never recorded. Afterwards, by deed of March 23, 1877, Perry A. Cline conveyed to Hatfield all the land devised to him by his father, thus embracing the "Old Home Place" and the undivided half of the Grapevine tract. This deed was recorded. Thus Hatfield owned legal title to half the Grapevine tract, but only equitable title to the other half, as Jacob Cline never conveyed to Hatfield the other half under said title bond. Hatfield then conveyed certain parts of the Grapevine tract to different persons, and by certain conveyances they came to be owned by J. D. Sergeant, and Hatfield conveyed the balance to Sergeant, so that Sergeant was owner of the entire Grapevine tract save a few small pieces. In 1888, Sergeant put tenants on the land, and in 1891 conveyed the land to Richard Torpin, Jr., John Lambert, Jr., and George Wharton Pepper, trustees, who have since continued in actual possession. This being the situation on the 6th of December, 1893, J. B. Ellison took a conveyance from two sons of the younger Jacob Cline, deceased, for the undivided half of said Grapevine tract, on the theory that their father had never sold it, and had died owning it, and that it descended to his sons. Ellison paid each of them one hundred dollars for his interest. Then Ellison, thus claiming half of said land, brought this suit against the trustees to divide the land and have half set apart to him. The trustees by answer utterly denied Ellison's claim, and set up said title bond from Perry A. and Jacob Cline to Hatfield, thus claiming

that Jacob Cline had by it sold his half to Hatfield, leaving him owner of no interest in the land at his death to descend to his sons, except dry legal title, and that defendants derivatively from Hatfield owned that half, and Ellison had notice of the right arising from said title bond when he took the conveyance from the sons of Jacob Cline; and they asked that Ellison be compelled to convey the right to them, he having acquired the legal title with notice of the equitable title created by the title bond. A decree gave Ellison half the land by directing a partition by which he was to get half. The trustees appeal.

The title bond from the two Clines to Hatfield, giving him all the Grapevine land, must be taken as established. I think the proof establishes it; but, besides, the answer alleges its execution, and the special reply does not deny it under oath.

A vital question is whether Ellison can be charged with notice of that title bond when he took the conveyance for half the land from the two sons of Jacob Cline. At that time the defendants, the trustees, were in possession, claiming the whole land, by tenants, and it is claimed that such possession affects Ellison with notice of that title bond. Before the use of writings to transfer freehold estates in the very land itself, it was effected by livery of seisin; that is, delivery of actual physical possession of the land itself. Possession was thus the signal sign that he in possession owned that land. So it remains to-day in the rule that possession is *prima facie* evidence of title in the possessor. One who buys of another that man's land must take the precaution to inquire of him what are his rights; for, if he does not, the law charges him with knowledge of that man's right as fully as if he actually had applied to him and been informed of such right. In these, our days, actual possession of land is notice to purchasers of the right of the person in possession. Opinions in *French* v. *Loyal Co.*, 5 Leigh, 641; *Western Co.* v. *Peytona Coal Co.*, 8 W. Va., 409; *Campbell* v. *Fetterman*, 20 W. Va., 399; *Chapman* v. *Chapman*, 91 Va., 397, (21 S. E. 813); *La Neve* v. *La Neve*, 2 White & T. Lead. Cas. Eq. 180; *Kirby* v. *Tallmadge*, 160 U. S. 379, (16 Sup. Ct. 349); 2 Pom. Eq. Jur. § 615; 2 Minor, Inst. 980. It takes the place of regis-

tration as to all the right of the occupants, says the *Chapman Case.* Of this possession of the trustees at the date of Ellison's purchase he had not merely constructive, but actual, notice, as he admits in his special replication to the answer.

But it is urged that this rule cannot be applied in this case, because there was on record the deed from Perry A. Cline to Anderson Hatfield passing half the land, and subsequent transfers bringing that half to the trustees, and that in such cases possession gives no notice of any ownership in the other half held under the unrecorded title bond ; that Cline's deed to Hatfield told the world that it conveyed what land Jacob Cline had willed to his son Perry A. Cline; and that will thus referred to showed a joint devise to the two sons, Perry A. Cline and Jacob Cline, and so any one might reasonably suppose that the defendants were in possession only under right to an undivided moiety; and being tenants in common with Jacob Cline or his heirs, the possession of these trustees was their possession, the possession of one joint owner being the possession of all. It can be said with force, as a general thing, that when one about to purchase sees that a person in possession has a certain title on record, the record discloses his full title, and he ought to be required to inquire no further, as he may ascribe such possession to that title and limit it by that title. Pom. Eq. Jur. § 616, lays down the principle that "where a title under which the occupant holds has been put on record, and his possession is consistent with what thus appears of record, it shall not be constructive notice of any additional or different title or interest to a purchaser who has relied upon the record, and has had no actual notice beyond that so disclosed." In *Woods* v. *Farmere*, 32 Am. Dec. 772, the great Judge Gibson said that, by putting a particular conveyance on record, the occupant does what he can to turn the inquiring purchaser from his path of investigation; that the party for whose benefit the record is made would be more misled by the use of it than if the occupant had pointed him to his possession alone, as that would have led him to the fountain of it, and revealed to him the entire claim of the occupant, and when the occupant points at-

tention to a particular deed on record he abandons every other index; that an exception might be the case of a parol agreement executed by possession, which is not susceptible of recordation ; yet, if it be the title mainly relied on, why record the other, when, if neither were recorded, possession would be notice of both?   This principle is to be found stated in various forms through the books.   16 Am. & Eng. Enc. Law, 803;  Wade, Notice, § 297;  *Kirby* v. *Tallmadge*, 160 U. S. 387. (16 Sup. Ct. 349);  *Smith* v. *Yule*, 89 Am. Dec. 167;  *Bank* v. *Wallace*, 45 Ohio St. 152, (12 N. E. 439);  *Harris* v. *McIntyre*, 118 Ill. 275, (8 N. E. 182);  *Rankin* v. *Coar*, 46 N. J. Eq. 556–572, (22 Atl. 177);  *Atwood* v. *Bearss*, 47 Mich. 72, (10 N. W. 112);  *Pope* v.  *Allen*, 90 N. Y. 302.

Properly applied, this doctrine is plausible, though there is authority denying it.   Some of the cases referred to in sustenance of it will be found to be cases bearing rather on the character of possession as being equivocal or uncertain, not such a sole possession in the one claiming the unrecorded title as to be noticed, as in the case of husband and wife, the wife claiming the unrecorded title, the husband being held the one in actual possession, not the wife; or grantor and grantee in possession,—and they do not assert that a sole occupant under the titles, one not recorded, will be limited in the effect of his possession as notice only of the recorded title.   But these cases do not go the length claimed for them in this case.   Now, when one is in possession with two rights derived from one person, one right shown by a deed on record, the other not, there is some force in applying the rule.   As, for instance, when a tenant enters under a lease or record, and later gets a deed from the landlord for the fee, not on record, or where a mortgagee is in possession under a recorded mortgage, and later buys the fee or equity of redemption by deed not on record; in these cases there is reason in saying that the occupant has but one right, that one recorded from this one grantor or lessor.   But will this theory be applied to say that as the one in possession has on record a deed from A., and also has an unrecorded deed from B. for the same land, his possession is no notice of his right under B?   That when he sees that deed on record from A. he

need seek information no further to explain how the occu-
pant claims? And it seems not sound to say that when a
man has the right of two joint owners, and the deed from one
only recorded, and that deed being for one-half, and the
party in possession of the whole, his possession goes no
further than the recorded half, and is no notice of his
rights to the other half. True, the possession of the joint
owner is the possession of another that is not adverse, and
it is fair to say that, as each has a right to possession, one
is in possession only under his own right, leaving the in-
terest of the other in him; but joint owners do sell their
interests, and, where one has conveyed to a stranger in
sole and exclusive possession, the other has not what
might be expected, if still owner,—concurrent possession.
Is not this sufficient to put a prudent purchaser on in-
quiry as to how the stranger holds? If you give posses-
sion any virtue at all as notice of the rights of the occu-
pant, why does it not in reason apply to the protection of
both rights? Why good for one and not for the other?
The fact that one deed is on record, and not the other,
makes no difference. I cannot see my way to say that, when
Hatfield and those under him were in possession under
Perry's deed to him passing his half, the Grapevine land,
and under the title bond passing Jacob's half, his posses-
sion was not notice of his right to Jacob's half, because,
and only because, his deed for Perry's half was on record.
To say, as said in the Pennsylvania case above cited
(*Woods* v. *Farmere*), that it indicates that the party has
abandoned his other claim is extravagant and unreason-
able; or to say that he has misled the second purchaser is
unreasonable; and to visit him with the loss of his land for
so misleading, as a penalty, is unreasonable. His deed
may not be so acknowledged as to be recorded; it may
have been burnt or lost. The law allows him to give no-
tice in two days,—by registry or possession. He gives it
by possession, and why should he suffer? There is au-
thority for denying the doctrine contended for in this case,
at least. Warvelle on Vendors (volume 1, p, 277, § 14)
says: "Every purchaser is charged with the duty of ex-
ercising diligence in making proper examination touching
the right and equity of others." In *Russell* v. *Sweezey*, 22

Mich. 235, the law held is that "actual possession of land is notice of the title of the party in possession, whatever it may be, and not merely that which the registry may disclose." He had a tax title and a deed from heirs, not recorded. In *Cosgray* v. *Core*, 2 W. Va., 353, one joint tenant purchased some interests, and had deeds for them recorded, and others not recorded, and it was held, it seems, that possession was notice of title to a purchaser of interests for which the occupant had no deed on record; thus disputing, even in the case of joint tenants, the exception contended for. As to those authorities saying that when one enters under one right, and afterwards acquires an additional one, possession will not be notice of the additional one, they do not apply; for Hatfield's acts, if amounting to possession, were done when we had the right of both Perry and Jacob Cline. So with the trustees, if they took possession for the first. And, moreover, I hold the doctrine that possession is notice of the rights, whenever acquired, existing at the date of the second purchase. As he is sole occupant, he is presumed to be the sole owner. Possession is *prima facie* proof of the title. If the second purchaser assumes him to be a partial owner only, he runs counter to this principle. He must ask him who best knows as to the extent of his right, because possession imports total ownership. I do not understand that, where there is actual possession, registry is necessary as notice to a purchaser or has anything to do with the question. The law says to the second purchaser that he must ask the occupant, "What are your rights?" If possession calls for this inquiry, why does it not do so just as much where a deed for part is on record and the deed for balance not on record? Asking would give information of both.

In the case of *Weisberger* v. *Wisner*, 55 Mich. 246, (21 N. W. 331), (opinion delivered by Cooley, C. J.), the exact point involved in the case at bar was decided contrary to the exception contended for by the appellee. In that case Muzzy was the owner of the whole of a quarter section of land, and entered into a contract with Wisner whereby the latter was to enter into possession for the benefit of both, and receive a deed for an undivided half of the land. The half thus contracted for was conveyed by Muzzy to

Wisner in 1862, and Muzzy and Wisner became tenants in common. Two years later Muzzy entered into another written contract with Wisner to sell him the other undivided half, and in 1873 did actually convey to him one-half of the remaining undivided half so contracted for. This made Wisner the owner of an undivided three-fourths of the land in question, with a contract from Muzzy for the remaining undivided one fourth, the legal title to which still remained in Muzzy. Wisner was in possession, and with the title in this shape executed a mortgage upon the land to a man by the name of White. White filed a bill to foreclose the mortgage, and the question arose direct in the litigation that followed whether the mortgage was a lien upon the outstanding one-fourth, or whether that lien was defeated by the fact that Wisner's possession of the land constituted notice to White of Wisner's unrecorded contract with Muzzy. White contended that Wisner was a "tenant in common with Muzzy, and, as the possession of the one tenant in common is presumptively the possession of both, and not hostile to the other, White, when he took his mortgage, had a right to understand that Wisner was holding in the right of himself and Muzzy jointly, and was not constructively notified by the possession of anything different." In other words, it was contended that the possession of Wisner was explained by his two recorded deeds—First, the one for an undivided half of the land; and, secondly, the other for an undivided fourth thereof; and that, in consequence, such possession being fully explained, and not being inconsistent with the records, did not constitute notice of his unrecorded contract for the remaining undivided one-fourth; but the court held otherwise, and in coming to this conclusion Chief Justice Cooley briefly stated the true doctrine in the following convincing language: "If Wisner had held a deed of the remaining interest in the land, which then appeared to stand in Muzzy, we see no reason why his possession should not have been constructive notice of it. It is true, as complainant says, that the possession was not apparently inconsistent with the record title; but this may be said in any case. It is possible that any possession may be that of a licensee or otherwise subordinate to the record title; and, if that

were sufficient reason for holding that the possession is no notice of actual rights, the principle on which decisions have been made, giving protection to occupants, would have very limited application. If Wisner had held no deed of an interest in the land, but had been in possession under a contract of purchase, the possession would indisputably have been notice of his rights. Why it should be any less so, when his title has been in part completed by conveyances, is not apparent. The conveyances, one would think, ought to fortify and strengthen his equities, instead of weakening and putting them in danger. It seems to be unquestionable that Wisner occupied exclusively, and White would have learned this fact on inquiry. No reason is apparent why he should not have been held bound to inquire as much in this case as in any other." Mr. Devlin in his work on Deeds, at the conclusion of section 770, after having discussed some of the authorities relied upon by the appellee, comes to the following conclusion, and makes use of the following language: "But the proper rule seems to be that possession should be held to be notice of all the rights of the party in possession, where the possession is open, visible, exclusive, distinct, and unequivocal." Possession by a tenant is notice, not only of his right, but also of his landlord's. Wade, Notice, § 286; 2 Pom. Eq. Jur. § 618; 16 Am. & Eng. Enc. Law, 804; Webb, Record Titles, § 236; Tied. Eq. Jur. § 92.

Speaking for myself only, I would advise the abolition by the legislature of the rule that possession shall be *per se* notice. The public registry is designed, not to preserve the owner's title, but to notify creditors and subsequent purchasers of transfers. Possession is not notice to creditors, but is as to purchasers. Why are not purchasers entitled to protection? Make people put their deeds and title bonds on record, and let the purchaser go to the public office and inquire, and not compel him to go far away to pick out the particular land, and see who is in possession and what his title. It is a dangerous doctrine, and not necessary to protect the owner in possession, who can record his papers. The reason for it ceased when transfers came to be written and when registration was provided. I notice that JUDGE ENGLISH speaks about

Hatfield's possession far back, while I refer to the possession of the trustees of the coal company, covering the whole title at the time Ellison purchased, as notice to Ellison. Hatfield was not then in possession. Why ask him or consider his long-past possession as revelant? I speak of their possession as notice to Ellison, and do not rely on Hatfield's possession, many years ago, as notice to Ellison.

Another reason given against applying in this case the rule that possession is notice is that in fact the defendants' papers did not show right to the Jacob Cline half, but only to the Perry Cline half. This contention is based on the fact that when Perry Cline conveyed to Hatfield the deed conveyed all the land willed to him by his father,—that is, the entire "Old Home Place," and one-half of the "Grapevine Tract,"—and when Hatfield conveyed to Sergeant he recited, "all the real estate herein conveyed, being part of a 5,000-acre survey conveyed from P. A. Cline to said Anderson Hatfield;" and that, as the Perry Cline deed passed only half to Hatfield, Hatfield passed only half to Sergeant; and, moreover, as the Perry Cline deed referred to his father's will, and that showed that Jacob Cline got this land equally with Perry, the entry of Hatfield or the trustees was only under claim to half, and the trustees were holding as co-tenants with Jacob Cline's heirs. This argument will not stand. When Perry Cline conveyed to Hatfield, it is true that he could and did convey only half, but, when Hatfield conveyed to Sergeant, Hatfield owned the whole half acquired from Perry Cline by both the old title bond and deed, and the other half from Jacob Cline by the same title bond, and Hatfield's deed to Sergeant conveys the land by several parcels or tracts as entireties, not moieties, and this after recital is, at most, only false description, and, apart from the granting parts, granting the tracts as wholes, and would fall under the old rule, "*Falsa demonstratio non nocet cum de corpore constat,*" stated in 1 Greenl. Ev. § 301. We plainly see that the intent was to convey the tracts as wholes, not merely half interests in them, and after-misdescription cannot defeat the plain intent. The intent in the recital was merely to refer to the former deed to tell what land was referred to, not what interest or estate was conveyed, which had been

done by the preceding granting part. And in fact they were but parts of the five thousands acres, as we know Hatfield sold off parts to others, leaving these tracts as parts. And just here is the place to say that Ellison himself says he investigated the records, and saw the will and those two deeds, before purchasing of the two Cline heirs the Jacob Cline moiety. That deed from Hatfield to Sergeant certainly conveyed specific tracts as entireties, not moieties therein, according to its legal construction, as Ellison was bound to know. This I think is plainly its construction, and surely it was not plainly the other way. Was not the deed itself a warning? And he himself says he saw other deeds from Hatfield for parts of this survey, —one, at least,—and they conveyed the land in toto, not half, and thought Hatfield had conveyed too much land. He does not claim that those deeds spoke any other language, but he says he could not see where Jacob Cline's interest had gone. Why not seek information, and that where it would be most likely found? and that was to inquire of these trustees or Sergeant or those others holding deeds for parcels. If he had gone to the trustees, he would have learned that they claimed the entirety. Why not inquire of those tenants on the land, when these deeds told him of claim, not to part, but of whole, interests? Ellison in his special replication to an answer admits that he knew the trustees were in possession when he purchased of the Cline heirs. Under the rule generally prevailing, these considerations would charge a purchaser with constructive notice of the former transfer; for that rule is that facts and circumstances sufficient in character to put a careful, prudent man on inquiry into the existence of some adverse title or claim will raise the presumption of notice. But in Virginia and this State that rule seems not to prevail, as Judge Baldwin said that "the doctrine that whatever puts one on inquiry amounts to notice is inapplicable to the statute in regard to both registered and unregistered conveyances," and that notice is insufficient if it merely puts a party upon inquiry. *Siler* v. *McClanachan*, 2 Grat. 312. The proof must be so strong as to affect conscience and fix *mala fides*. Such knowledge is never presumed, but must be proved, and proved clearly. Mere

suspicion of notice though strong, will not suffice. It must be enough to prove the party guilty of fraud. *Mundy* v. *Vawter*, 3 Grat. 518, syl. pt. 3; *Vest* v. *Michie*, 31 Grat. 151; Minor, Inst. 977; Bart. Ch. Prac. 1005. But still all facts and circumstances may be considered. There is probably no difference in the Virginia law and that elsewhere, except in degree of proof. Do not all the foregoing circumstances come up to the standard required, particularly when we add to them the facts stated below, that the price paid by Ellison was a mere pittance for the land, and he took a deed without warranty, and the legal import of those two facts, as stated below?

Another forcible circumstance is that at the very instant of buying from the Cline heirs, as Ellison himself states in evidence, he agreed to pay them for hunting up evidence to prove their heirship. This imports that he expected litigation to sustain this claim to half the land. He says he then intended to sue for partition. Litigation with whom? Clearly, with the trustees, for he says he then knew they were in possession. If he did not know they claimed the entire land, acknowledging no one else's right to half, why expect trouble with them? And if he expected trouble with others to whom Hatfield had sold entireties, the same fact would lead a reasonable man to assume the same claim of ownership under his conveyance to Sergeant. He says he knew, and told the Cline family, that Hatfield had sold more land to parties than he owned. This he did in an inquiring way, as if to learn from them the facts about it. The Widow Cline and the two sons denied his right to do so. Why did he not inquire of those persons on the land? Why not look at the papers on record under which those in possession claimed, which would have told him they claimed the whole, when he had so much to warn him and put him on inquiry? Why not take steps within his reach,—ascertain in quarters readily accessible? It was only fair to ask the trustees in possession if they claimed the whole. There is in brief of counsel an argument that, where one is in possession under a recorded title, his possession is no notice of other claim, and that this is especially the case where the one in possession is a co-tenant with another, since his possession is in har-

mony with the title of his associate, the possession of one co-tenant being that of the other, and that, as possession is not *per se* notice, but, at most, only a circumstance calling for inquiry, the trustee's possession in this case cannot even go that far, as they were co-tenants with Jacob Cline's two heirs. How were they co-tenants? If we look only to Perry Cline's deed to Hatfield, operating to convey only Perry's half, Hatfield would be a co-tenant with the Cline heirs; but remember that both Perry and Jacob Cline made that title bond to Hatfield which, though not conveying legal title, yet in equity worked a destruction of the joint estate vested in them under their father's will by devesting their right and vesting a sole and several right in Hatfield. The trustees were not co-tenants with the Clines. 2 Minor, Inst. 478.

Another matter is in the claim that the deeds to Ellison are only quitclaim, and therefore he cannot hold the place of a purchaser for value, without notice. I think the deeds not mere quitclaim, but conveying the land itself. They "grant, bargain, sell, and convey all their title and interest in and to" that tract, etc.; and another clause declares, "It is hereby intended to convey one undivided half interest," etc., and has special warranty. *Touchard* v. *Crow*, 81 Am. Dec. 108; Devl. Deeds, § 27. But, if purely quitclaim deeds, their character would not prevent Ellison's claiming the position of a purchaser for value without notice. They pass title. 3 Kerr, Real Prop. § 2297; *Brown* v. *Jackson*, 3 Wheat. 451. Upon what I have always thought a very refined and illogical theory, the supreme court of the United States and others have held that a mere quitclaim will not allow its holder to say he is such purchaser. *May* v. *Le Claire*, 11 Wall. 217, 232; *Dickinson* v. *Colgrove*, 100 U. S. 578, 579; *Wood* v. *Manufacturing Co.*, (Ala). 13 South. 948; 2 Pom. Eq. Jur. § 753. This is on the idea that the grantor merely releases such right as he has, without warranty, thus indicating there may be claims or interests affecting the title, and the grantee in accepting it is notified by the grantor that there may be some defect in his title; that such deed is used by speculators taking chances, for merely nominal consideration, and subject to any equity against the grantor. 2 Warv. Vend. 615.

Where this rule prevails, it applies to quitclaim deeds, strictly so called, not to those passing the very land itself. Webb, Record Titles, § 27. But the supreme court overruled itself in *Moelle* v. *Sherwood*, 148 U. S. 21, (13 Sup. Ct. 426), holding that a "quitclaim deed does not of itself prevent a party from becoming a *bona fide* holder, and the doctrine in many cases, that the grantee in such a deed cannot be treated as a *bona fide* purchaser, does not rest on any sound principle." And in *U. S.* v. *California Land Co.*, 148 U. S. 31, (13 Sup. Ct. 458), the court repeats this holding, and recants seven former contrary decisions. Other authority accords with this. *Chapman* v. *Sims*, 53 Miss. 163: Devl. Deeds, § 672; *Eoff* v. *Ervine* (Mo. Sup.) 18 S. W. 907; 2 Warv. Vend. 616; Jones, Real Prop. §§ 1394-1396. The same author says that the fact that a purchaser takes such a deed, while it does not *per se* shut him out from the position of a *bona fide* purchaser, is a circumstance to be considered with others.

In this connection comes the fact that the second purchaser paid for the half of from two thousand to three thousand acres of coal land traversed by the Norfolk & Western Railroad, on which were vast operations in the mining of coal, only $200. A deed without warrant to make good title would indicate suspicion that there might be some trouble, and a consideration grossly inadequate. Strange that a vendor would sell an estate worth many thousands for a pittance. The very fact tells the purchaser that there may be trouble as to the right, and intimates to all that it was a mere chance that was being sold. Why a chance, unless it be from a suspicion of trouble? To give a purchaser the benefit of *bona fides*, it is necessary that he pay a valuable consideration, and this does not mean a full and adequate consideration, but a fair consideration; as, if the consideration be not in keeping with the character of the property, but grossly inadequate, the purchaser will not receive the benefit of *bona fides*. 2 Warv. Vend., p. 610, § 10; 2 Pom. Eq. Jur. § 747. And this is more so when a deed is taken conveying without warranty. Dembitz, Land Tit. p. 976, § 132. The principle is well stated in *Worthy* v. *Caddell*, 76 N. C. 82: "One who claims against a prior donee or creditor, as a purchaser for value, must prove a

fair consideration; not the full value, but a price which does not cause surprise, or warrant a suspicion of fraud or contrivance on the part of the purchaser." Justice Field, while holding that one may be a *bona fide* purchaser under a deed without warranty considered a reasonable consideration an important matter in passing on the question of good faith. Opinion *Moclle* v. *Sherwood*, 148 U. S. 28, (13 Sup. Ct. 426).

It is strenuously urged that the answer of the defendants set up this title bond from Perry and Jacob Cline, calls for affirmative relief by specific performance of it by conveyance of the land to the defendants, and that the defendants must first show payment of the five hundred dollars purchase money, but have not shown it. First, we are able upon the facts to hold that payment was made. This is established by the rule that a bond is presumed paid after twenty years from its maturity. 18 Am. & Eng. Enc. Law, 207; *Criss* v. *Criss*, 28 W. Va., 388; *Sadler* v. *Kennedy*, 11 W. Va., 187. But it is said that, under an executory contract for the sale of land, this rule does not apply, at any rate not to base a claim on it for affirmative relief, if it would avail as a defense in a suit for purchase money. I see no reason why this presumption should not apply to a debt for land as well as anything else. It is only a debt, no matter what consideration. The true rule is given in *Gregory* v. *Com.*, 121 Pa. St. 611, (15 Atl. 452), as follows: "All debts excepted out of the statute of limitation (that is, where that statute does not apply), unclaimed and unrecognized for 20 years, are, in the absence of sufficient explanatory evidence, presumed to have been paid." Full note *Alston* v. *Hawkins*, (N. C.) 18 Am. St. Rep. 874, 879 (s. c. 11 S. E. 164). This presumption of payment bars a debt secured by a deed of trust, or reserved as a lien for purchase money in a conveyance of legal title. *Pitzer* v. *Burns*, 7 W. Va., 63; *Camden* v. *Alkire*, 24 W. Va., 674; *Coles* v. *Withers*, 33 Grat. 186; Bart. Ch. Prac. 117. And the case of *Hanna* v. *Wilson*, 3 Grat. 243, admits, in the case of a sale of land under an executory contract, that the presumption applies. So *Massic's Case*, 80 Va. 790; *McCormick* v. *Evans*, 33 Ill. 327; *Morrison* v. *Funk*, 23 Pa. St. 421. Where notes are yet in the hands of the vendor,

or it is any way shown the debt exists, no time bars in such case. As it is a presnmption of a fact raised by law, I do not see why it could not be the basis for affirmative relief in enforcing a conveyance as well as to defend a suit for purchase money. It was held otherwise in *Morey* v. *Farmers' Co.*, 14 N. Y. 302. It was said to be a shield, not a sword for affirmative aggressive action, as stated in 13 Am. & Eng. Enc. Law, 674. This is the only case of high authority so holding. The case of *Scarlett* v. *Hunter*, 56 N. C. 84, cited by counsel to support this position, does not do so. There the vendee sued for a deed, tendering purchase money, the vendor relying on time as defense. This question did not arise. This presumption shifts the burden of proof, and requires the creditor to show nonpayment. Jones, Ev. § 63 ; *Stover* v. *Duren*, 51 Am. Dec. 634. It would seem ridiculous to hold, in a suit brought by the vendor for purchase money, that he was barred by the presumption, and then turn right around and hold that the purchaser suing for a deed could not rely on the presumption to prove payment. The one could not get his purchase money; the other could not get his deed. In this case the title bond fixed no time for payment of purchase money, and it was in law payable instantly, and nearly twenty-six years had elapsed from the date of the title bond. Besides, evidence shows that in 1868 Hatfield paid Perry Cline one hundred and sixty dollars in a mule on the title bond, and paid Jacob Cline one hundred and fifty dollars in money, and Perry Cline made a deed under the title bond in 1877. These payments, coupled with so great a stretch of time, and no claim ever afterwards shown for purchase money, justify us in holding it paid. But, suppose it were not paid; can one man, having notice of another's prior purchase, step in and make a second purchase, and, when sued to avoid the deed he wrongfully obtains, plead that the first purchaser had not paid the purchase money ? This suit is one to avoid this second purchase; and make the second purchaser give up his right to the first. There is no error of which he can complain, if others could. I would reverse the decree, and deny Ellison any right to the land.

Dent, Judge, *concurs.*                              *Affirmed.*